FIRST BAPTIST SOCIETY IN LEEDS *vs.* PERRY GRANT.

*Meeting-house. Pew-owners—rights of. Division of time of occupying a meeting-house—under what conditions.*

A meeting-house erected by a contract with a religious society, duly organized under an act of incorporation, upon land owned by the corporation, is owned by the corporation and not by its members.

The owners of pews in a meeting-house owned by a corporation, have only an easement in and not a title to the freehold.

The pew-owners have only a qualified property in the pews of a meeting-house owned by a corporation.

Two conditions must co-exist before there can be any legal action under the provisions of R. S. c. 12, § 35, for obtaining a division of the time of occupying a meeting-house; (1) there must be a "house of public worship owned by persons of different denominations;" and (2) in such house, so owned, "an organized society or its members must own at least five pews."

ON REPORT.

TRESPASS for breaking and entering the plaintiff's close and breaking and opening their meeting-house, in Leeds, on Aug. 14, 1870.

Plea, general issue, with a brief statement, that, at the time of the supposed trespasses, the defendant was a pew-owner in the meeting-house described in the writ, and had lawful authority by virtue of such ownership to enter the meeting-house and occupy his pew; that he only entered at the time alleged for the purpose of religious worship and other lawful purposes; that the defendant and fourteen others named with the First Universalist Society in Leeds, were owners of pews in said meeting-house and members of the First Universalist Society in Leeds; that prior to the supposed trespasses, the time for occupying said meeting-house had been alloted to the defendant and the other said pew-owners, pursuant to the statute, and that he only entered said house at the times designated in the allotment.

It appeared, *inter alia*, that Thomas Francis and others, on Aug. 17, 1804, were duly organized as the First Baptist Society of Leeds,

under a charter dated June 23, 1804; that in August, 1804, the society voted to purchase land on which to build a meeting-house, of Giddings Lane, who subsequently conveyed by deed of warranty to the First Baptist Society the land therein described; that Samuel Lane in December, 1804, contracted with the corporation to erect a meeting-house upon the land, and have "for the money which may accrue from the sale of pews;" that the house was built, and accepted by the committee in 1806; that the organization has been kept up until the present time.

The acts constituting the alleged trespass were admitted as set out in the brief statement.

It also appeared that on March 13, 1830, John Francis and fifty-nine others, were organized as the First Universalist Society in Leeds; that in 1837 it was reorganized; that in 1837 the meeting-house having become considerably dilapidated and unfit for a place of worship, the First Universalist Society was invited to aid in repairing and remodeling the house; that accordingly the house was lowered some four feet, twelve feet added on the south end,.and carried up for a belfry, the old windows taken out and new larger ones substituted, and really the inside of the house thoroughly remodeled; that in 1837, Thomas Francis and thirty-four others entered into the following contract:

"Know all men by these presents, that whereas the two religious denominations in the town of Leeds known by the names and titles of the First Baptist Society and the First Universalist Society, having taken into consideration the high importance of a preached gospel, and being destitute of a suitable house for the worship of God, did, on this second day of July, A.D. 1836, by mutual consent, agree to alter and repair the Baptist meeting-house (so called). And whereas the societies aforesaid have in good faith made the necessary alterations and repairs on said house, they do hereby further agree that the said Universalist Society shall have the right of occupying said house on the last Sabbath in each month, for the full time of five years from the second day of February, one thousand eight hundred and thirty-seven, and the said Baptist Society

are to have the right of occupying said house all of the remaining Sabbaths during that time; and at the end of five years from the said second day of February, 1837, the said societies are to apportion the time that each society are to occupy said house, in proportion to the amount of property each society may then have in said house for another term of five years. And the like apportionment is to be made every five years afterwards,— reference being had at each apportionment to the amount of property that each society may have in said house. And the said societies do hereby further agree, that whereas it may be necessary to raise a sum or sums of money to defray the expenses of repairs already made on said house, or which may hereafter be necessary to keep the same in repair, it shall in all cases be raised by a tax on the pews, reference being had to the value of the same; but no tax is to be assessed on the pews for the support of the ministry, and this agreement shall be entered on, and become a part of the records of the societies aforesaid, provided, nevertheless, that nothing in this agreement shall prevent either of the societies from purchasing of, or selling to the other society all the right they may have in said house.

"Now, therefore, we the undersigned, being pew-owners in said house, do hereby covenant and agree, each with the other and the societies aforesaid, that to the extent of our influence and abilities, we will cause the above agreement to be carried into full effect and execution. In testimony whereof, we have hereunto set our hands, this eleventh day of March, one thousand eight hundred and thirty-seven;" and the agreement was adopted by the First Universalist Society and entered upon their records.

It also appeared that on April 14, 1849, the First Universalist Society, at a meeting duly called, "voted to accept the agreement entered into with the Baptist Society, relative to the occupancy of the meeting-house, it being the same as certified by their clerk, was accepted by the First Baptist Society on March 1, 1849; and that the prudential committee be instructed to carry out and perfect the agreement," which was as follows:

"To all whom it may concern: The First Baptist Society and

the First Universalist Society in the town of Leeds, do hereby mutually agree to the following arrangement for the occupancy of the meeting-house in Leeds Center, to wit, the Universalists are to have the right to occupy said house every fourth Sabbath in rotation, for the full term of ten years from the last Sabbath in April, 1849, except when the said fourth Sabbath shall come on the days set apart by the First Baptist Church in said Leeds for their communion service, which invariably occurs on the first Sabbath in the month; and the said Universalist Society are to have the right to occupy said house as many Sabbaths in each year for the time aforesaid, as they may be deprived of by the above exception, to be agreed upon by the respective societies before the time of occupying; and it is further agreed the said Baptist church and society may occupy said house the last Saturday before the first Sabbath in each month, and the said Universalist Society have right to as many Saturdays in proportion to the time they are to occupy said house. The above agreement is to settle all disputes by and between the said societies in relation to the occupancy of said house for the full term of ten years from the date above, and nothing in this agreement is to disturb or vary the legal title, claim, or privilege that either of the societies have or may have in the property of said house."

The record of the First Universalist Society contained the following:

" March 2, 1844.

I hereby certify that the above-named Baptist Society, at their annual meeting on the first day of March, 1849, voted to accept the above agreement, and that it be recorded in records of the society, provided the said Universalist society do, within a reasonable time, accept of it, make it a part of their records, and certify the clerk of the said Baptist Society that they have done so.

Attest :  Thomas Francis,
*Clerk of the First Baptist Society in Leeds.*

A true copy. Attest : Israel Herrick, *Clerk.*"

First Baptist Society in Leeds *v.* Grant.

On May 2, 1870, the defendant and several others alleging themselves to be "members of an organized society, called the First Universalist Society of Leeds," addressed a petition to Job Prince, a justice of the peace and quorum for the county of Androscoggin, making the necessary averments and praying for due proceedings under R. S. c. 12, § 35 *et seq.*, for an allotment. After due proceedings had, a formal allotment was made to the minority of "fourteen weeks in each year, as their part of the time that they may occupy said house, the same being in proportion to the amount they own therein, and do designate the week commencing Sunday, the seventeenth day of July next, and every fourth week thereafter, and one additional week, being the week next succeeding the week to which they are entitled in October as above, to be the weeks in each year which the minority may, if they please, occupy said house."

The remaining essential facts appear in the opinion.

The full court were to enter such judgment as the law required.

*W. P. Frye & J. W. Cotton*, for the plaintiffs, cited *Lord* v. *Chamberlain*, 2 Greenl. 67 ; *Minot* v. *Curtis*, 7 Mass. 441 ; *First Parish in Sutton* v. *Cole*, 8 Mass. 96 ; New Am. Cyclop. " Parish" ; Washb. on Easements, 604 ; R. S. of 1857, c. 12, § 30 ; 3 Kent's Com. 532 ; *Gay* v. *Baker*, 17 Mass. 403 ; *Bates* v. *Sparrel*, 10 Mass. 323 ; *Revere* v. *Gannett*, 1 Pick. 169 ; *Jackson* v. *Rounsville*, 5 Met. 130 ; *Kimball* v. *Second Parish in Rowley*, 24 Pick. 347 ; *First Cong. Soc. in N. Bridgewater* v. *Waring*, 24 Pick. 304 ; *Daniel* v. *Wood*, 1 Pick. 102 ; 12 Mod. 420 ; *Fisher* v. *Glenn*, 4 N. H. 180.

*Nahum Morrill & George C. Wing*, for the defendant, cited R. S. of 1857, c. 12, §§ 27–32 ; Public Laws of 1870, c. 137 ; Public Laws of 1867, c. 71 ; *Second Cong. Soc. in N. Bridgewater* v. *Waring*, 24 Pick. 304 ; *Revere* v. *Gannett*, 1 Pick. 169 ; *Kimball* v. *Rowley*, 24 Pick. 347.

APPLETON, C. J.   The plaintiffs were incorporated by an act of the legislature of Massachusetts, approved June 23, 1804.   Under this act the incorporators were duly organized.   This organization has been legally kept up to the present time.   The land upon which their house of worship was erected was conveyed to them by their corporate name on 24th October, 1806.   Their house was erected on the land thus conveyed to them, the same year, under a contract with the plaintiff corporation.   The land purchased and the house erected thereon were owned by the plaintiff corporation and not by the members of the same.

The several pew-holders had an easement in and not a title to the freehold.   Each pew-holder had a property in his pew and the right to its exclusive possession.   But this right was subject to the paramount rights of the parish.   The parish was the legal owner of the house and the land on which it stood.   It had the control of the house; the right to determine at what hours on the Sabbath and at other times it should be open for public worship; to select the pastor, to contract with him as to the terms of his settlement, to determine who should be admitted to the pulpit in his absence, and to see that the house should be kept in a proper condition for its public use.   The pew-holder has certain privileges by reason of his ownership,—such as passing through the aisles, being addressed from the pulpit, etc.   His property is not absolute but qualified.   He may own a pew and yet not be a member of the parish corporation.   The corporation may own the land and building thereon, while the pew-holder has only a qualified property in his pew.   *Gay* v. *Baker*, 17 Mass. 169; *Jackson* v. *Rounsville*, 5 Met. 130; *Revere* v. *Gannett*, 1 Pick. 169; *Daniel* v. *Wood*, 1 Pick. 102.

The plaintiffs occupied and controlled their house, making repairs on the same until March 1, 1837, when (the First Universalist Society in Leeds having been previously organized) the pew-holders in the same, being in part members of the First Baptist Society and in part of the First Universalist Society, entered into an agreement as to the occupation of the house for five years, from

Feb. 2, 1837, with an agreement as to the further occupation at the expiration of said term. The conclusion of the agreement is in these words: "Now, therefore, we the undersigned, being pew-owners in said house, do hereby covenant and agree, each with the other and the societies aforesaid, that to the extent of our influence and abilities, we will cause the above agreement to be carried into full effect and execution," etc. This contract, it will be perceived, was a contract between individuals and binding on them, and not on the two parishes of which they were members.

On the first of March, 1849, the plaintiffs and the First Universalist Society made an agreement as to the occupation of the plaintiffs' house by them respectively, for the full term of ten years, in which is the following clause: "The above agreement is to settle all disputes by and between the said societies in relation to the occupancy of said house for the full term of ten years from the date above, and nothing in this agreement is to disturb or vary the title, claim, or privilege that either of the societies has or may have in the property of said house."

After the year 1850 the records of the Universalist Society do not show any meetings of its members for the choice of officers.

Upon the petition of B. Davis and others (of whom the defendant was one), a warrant was duly issued calling a meeting of the petitioners, at the Leeds Centre meeting-house, on the 18th of January, 1869, to organize a religious society to be known as the First Universalist Society in Leeds. The petitioners met at the time and place appointed and organized said society in due form of law, and admitted certain persons as members.

It will be perceived that the society, organized in 1869, is a new one, and has no connection with, nor rights derived from, the preceding society, which bore the same name; and that the plaintiffs have not parted with their interest in and title to the land purchased by them in 1806 and the building erected by them thereon. The plaintiffs, therefore, are entitled to maintain an action for any trespass upon their estate.

The acts complained of are not denied, but the defendant justi-

fies as a pew-holder, and under certain proceedings had by virtue of R. S. 1857, c. 12, §§ 30, 31, 32.

As a pew-holder, the defense fails, for the acts done were not in pursuance of his rights as such.

.Nor can the defense be sustained under any of the provisions of the statute upon which it is based.

By R. S. 1857, c. 12, § 30, " when a house of .public worship is owned by persons of different denominations, and when an organized society, or its members, own five pews therein, one or more of the minority, owning not less than five pews, may apply to a justice of the peace and quorum, to obtain a division of the time of occupying the house ; and he shall call a meeting of the owners, by posting up a notice in a public place, in or about the house, thirty days at least before the meeting, stating the time, place, and object of the meeting."

Two conditions must co-exist before there can be any legal action under the provisions of this and the following sections: (1) there must be a house of public worship owned by persons of different denominations; (2) in such house, so owned, an organized society or its members must own at least five pews.

Now, in fact, neither of these conditions exists. (1) The house is not owned, "by persons of different denominations." It was built and is owned by the plaintiff corporation. The interests of the parish and of the pew-holders are different and distinct. The pew-holder may own his pew and thereby have an easement in the house, but he in no way can be regarded as owning the house in which his pew is.

(1) Neither does any organized society, or its members, own five pews or more therein ; that is, " in a house of worship owned by persons of different denominations ;" for it will be observed, it is only to a case of ownership of pews in a house so owned that this section applies. It does not apply where the title is in the corporation, for when one has been organized in pursuance of the previous sections of c. 12, " such corporation by a major vote of its members may use and control the meeting-house or building for

public worship, partly or wholly owned by them, as they please," etc., § 29.                     *Defendant defaulted.*

KENT, DICKERSON, DANFORTH, and TAPLEY, JJ., concurred.

WALTON, and BARROWS, JJ., did not concur.